WOODLAWN HOSPITAL, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 77–2156.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1978.

Decided May 2, 1979.

S. Richard Pincus, Chicago, Ill., for petitioner.

Michael Murchison, NLRB, Washington, D. C., for respondent.

Before SWYGERT, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

Woodlawn Hospital brings this appeal to challenge the November 23, 1977 order of the National Labor Relations Board ordering the hospital to grant preferential reinstatement rights to 59 individuals who had been employed by the hospital preceding a 1972 strike. The question presented for review is whether these strikers are "employees" within the meaning of section 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3), thereby entitling them to reinstatement.

I

In December of 1971 Woodlawn Hospital entered into an interim recognition agreement with the Hospital Employees Labor Program as representative of the hospital's nurses' aides as well as dietary and housekeeping employees. At this time, the National Labor Relations Act did not apply to health care institutions and thus did not impose any bargaining obligations on Woodlawn. Contract negotiations were unsuccessful and on June 14, 1972 eight nurses' aides and an elevator operator walked off the job several hours before the end of their shift. A strike ensued in which 74 of the 117 employees in the bargaining unit participated.

Shortly after the strike began, in the summer months of 1972, Woodlawn Hospital began hiring employees to replace the strikers. The employees hired were assured that they were being hired for permanent positions. By fall, the hospital had 95 employees working in the bargaining unit not including the strikers.

On August 4, 1972, the hospital sent letters to between 34 and 50 strikers. The letter informed them that

> Inasmuch as you have resigned your employment in accordance with established personnel policies of Woodlawn Hospital, the hospital has found it necessary to permanently replace you.

The letter also requested that the strikers report to the hospital to remove the contents from their lockers.

In accordance with the interim recognition agreement, the hospital and the union engaged in nonbinding factfinding. Most of the strikers attended the hearings held on August 1 and 2 and September 15, 1972. At the hearing, Woodlawn stated its position that the majority of the strikers were assumed to have resigned in accordance with the hospital policy set out in its personnel manual.[1]

1. The manual reads:
   If an employee is absent for a period of three consecutive days or longer without being excused by his department manager, it will be assumed that the employee has resigned without giving notice and all benefits will be forfeited.

The fact finder concluded that the hospital had engaged in conduct which undermined the union and conditioned a climate which caused the union to strike in contravention of a no-strike commitment in the interim recognition agreement. The fact finder recommended reinstatement of the strikers. Woodlawn rejected the recommendation.

On November 8, 1972, Woodlawn sent letters to 46 strikers offering them reinstatement. On the same date, it also sent letters to 19 strikers informing them that they were ineligible for reinstatement, stating:

The purpose of this letter is to advise you that based upon facts within our knowledge you are not eligible for reinstatement to the job you formerly held.

If you wish to know the basis of this decision not to offer you reinstatement you may make an early appointment with Miss Heisse . . . to discuss with her the specific reasons. If you believe that the grounds for this decision are unjust you will be provided an opportunity to present your reasons in writing to the Employee-Management Committee, for their review and recommendation to me [the Administrator].

Only three strikers accepted the offer of reinstatement. The hospital reinstated them with existing benefits, but with seniority reduced by the amount of time they were on strike.

The union and the hospital continued settlement negotiations through August 1, 1974. Throughout that period reinstatement was a central issue in the continuing dispute. In June of 1974 the Chairman of Woodlawn's Board of Directors gave tentative approval to a settlement agreement providing for immediate reinstatement of 29 strikers, submission of the rights of nine strikers to arbitration, and giving the balance of the strikers preferential rights as vacancies opened. The Board of Directors rejected the settlement, however, and on August 1, 1974 the union was notified that

Woodlawn did not intend to continue the negotiations.

After settlement negotiations terminated, the union wrote the Federal Mediation and Conciliation Service on August 6, 1974 to advise them that a strike was in progress. The attorney for the union reported:

The issues relate to the hospital's refusal to reinstate approximately 76 employees who were unfairly terminated because they aided, supported or otherwise assisted the Hospital Employees' Labor Program. It appears likely that the strike will continue because the hospital refuses to re-employ said employees. . .

On August 19, 1974, the union wrote the hospital advising it that the strike would end at 12:01 a. m., August 25, 1974—the date that the Health Care Amendments to the National Labor Relations Act became effective. The letter informed the hospital that the strikers would seek employment on August 25, but that if the hospital refused "any individual among them employment" the strike would resume September 5, 1974. The hospital responded to the union by letter of August 22, 1974, advising the union that the strikers' former positions had been filled but that they would accept applications for employment to be considered when positions became available.

Picketing and handbilling continued until August 23, 1974. On August 25, 1974, the Union wrote Respondent as follows:

This is to advise you that an unconditional offer to return to work, effective immediately, is hereby made by and on behalf of the following-named employees of the Woodlawn Hospital.

A list of 64 strikers was attached to this letter, which was hand-delivered to a security guard on duty at the hospital at 12:07 a. m., August 26. A copy was also sent to the hospital administrator and was received on August 27.

On August 26, 1974, 41 strikers appeared at the hospital to request reinstatement.

They were all treated as new employees and required to fill out full applications. Of those who completed applications, six were hired, but three failed the physical exam. By the date of the hearing Woodlawn had hired 22 new employees never previously employed by the hospital.

On July 13, 1976, the General Counsel issued a complaint against Woodlawn for violating section 8(a)(1) and (3) of the Act by denying preferential reinstatement rights to the strikers. A violation was also cited for reemploying three of the strikers without according them all accrued benefits. The administrative law judge found that Woodlawn had violated the National Labor Relations Act by these actions and ordered the preferential reinstatement of 59 strikers as well as the adjustment of benefits for the strikers already reemployed. The decision was premised on alternative grounds. First, the judge concluded that strikers terminated for union activity before the effective date of the Health Care amendments were still "employees" under the Act and therefore entitled to strikers' reinstatement rights. Alternatively, she concluded that the employee status was retained because the strikers had not been effectively discharged or their discharges were rescinded. The ALJ refused to find, however, that the hospital had discriminated against the strikers, as applicants for employment, on the basis of union activity. The Board affirmed, 233 NLRB No. 117 (1977), and this appeal followed.

## II

The Board premises the reinstatement order in this case on its remedial powers conferred by section 10(c) of the Act. 29 U.S.C. § 160(c). Under section 10(c) the Board is authorized, "upon . . . [finding] that . . . [the employer] . . . has engaged in or is engaging in any . . . unfair labor practice, . . . to take such affirmative action including reinstatement of employees . . . as will effectuate the policies of [the Act]." It is axiomatic

that reinstatement cannot be ordered by the Board unless the employer has violated the Act. *NLRB v. Blades Manufacturing Corp.*, 344 F.2d 998, 1004 (8th Cir. 1965); *NLRB v. Thayer*, 213 F.2d 748, 752–53 (1st Cir.), *cert. denied*, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954). Thus only if Woodlawn has committed an unfair labor practice can the order of reinstatement be enforced.

There is no question that Woodlawn did not become an "employer" subject to the National Labor Relations Act and the Board's jurisdiction until August 25, 1974, the effective date of the 1974 Health Care Amendments to the Act. Public Law 93–360. Therefore the Board disclaims reliance on any actions of the hospital prior to August 25, 1974 to support its finding of a violation. In an attempt to avoid retroactive application of the statute, the Board relies solely on the Hospital's post-effective date refusal to grant reinstatement rights to the strikers as the basis of the unfair labor practice.

The Supreme Court established in *NLRB v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), that an employer commits an unfair labor practice by refusing reinstatement rights to economic strikers once they have made an unconditional offer to return to work. This court's decision in *Laidlaw Corp. v. NLRB*, 414 F.2d 99 (7th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970), clarified that an employer's obligation to extend preference to strikers for vacancies continues even after permanent replacements have been hired. An employer who fails to comply with the *Fleetwood* and *Laidlaw* mandate violates the Act. No proof of discriminatory motivation is required.

█ There is no question that Woodlawn did not preferentially reinstate the strikers as vacancies arose even after the strikers had made an unconditional offer to return to work.[2] The Administrative Law Judge

---

2. Contrary to assertions by Woodlawn, we conclude that the Board's finding that the union

did make an effective unconditional offer to return to work is supported by substantial evi-

found that after August 25, 1974 the employer hired only three strikers while hiring 22 new employees.[3] Thus if *Laidlaw* applies to the hospital, it did violate the Act, as discussed *infra*, and the order of reinstatement would be a proper remedy. However, the Board concedes that in this case *Fleetwood* can only be the basis for an unfair labor practice and an order of reinstatement if the applicants denied reinstatement were "employees" within the meaning of section 2(3) of the Act.[4]

The definition of "employee" is quite broad:

> The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless [the Act] explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment . . . .

§ 2(3), 29 U.S.C. § 152(3). The Board relies on the breadth of the literal reading of the definition to conclude that even if the strikers were discharged prior to the effective date of the Act, their employment did "cease in connection with a labor dispute" and thus their status as employees was not vitiated. Accordingly, under *Fleetwood*, Woodlawn would have violated the Act, as so construed, by refusing reinstatement rights to discharged strikers.

■ We cannot agree. Although we do agree that the strikers were involved in a "current labor dispute,"[5] we think the precedents, as well as the applicable policies of the National Labor Relations Act and the Health Care Amendments, establish that a discharge which does not violate the Act when effected, terminates the employee status of a striker, as well as that of any other employee.

The construction of the definition of "employee", like other statutory construction, is governed by congressional intent. Thus "[t]he term 'employee' 'must be understood with reference to the purpose of the Act and the facts involved in the economic relationship.'" *Allied Chemical & Alkali Workers, Local One v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 167, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971), *quoting NLRB v. Hearst Publications*, 322 U.S. 111, 129, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). It is therefore useful to consider the consequences of the scope given this definition in the law of labor relations. Under the structure of the National Labor Relations Act, the definition of "employee" determines when a worker is eligible for the protection of the Act's remedies. "Employees" are eligible, while individuals who are not "employees" generally are not.[6] Conversely, the definition determines when an employer is free to discipline a worker without regard to the strictures of the Act. In applying the definition to various circumstances, it would therefore seem appropriate to assess the Congressional purpose—that is, to protect the particular worker or to maintain the

dence. The fact that their first offer was conditional does not bar them from *Laidlaw* rights when they subsequently do make an unconditional offer. *H. & F. Binch Co. v. NLRB*, 456 F.2d 357 (2d Cir. 1972). It also appears the hospital may have waived this argument. *Colecraft Mfg. Co. v. NLRB*, 385 F.2d 998, 1005 (2d Cir. 1969).

3. Three additional strikers were hired but subsequently failed the required physical.

4. Under limited circumstances, the reinstatement of strikers who have lost their employee status has been permitted by some courts as a possible remedy for an employer's violation of the Act. *See NLRB v. Thayer Co.*, 213 F.2d 748

(1st Cir.), *cert. denied* 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954). The Board does not argue that any such theory is applicable to this case. The analysis appropriate to this case should not be read to discredit the *Thayer* case or related doctrines.

5. Apparently, the strike continued for only one minute beyond the effective date of the Act. Nonetheless, the evidence reveals that picketing had continued through August 23 and settlement negotiations through August 1, supporting the ALJ's determination that the dispute was still "current."

6. *See* note 4 *supra*.

disciplinary freedom of the employer—in order to derive the proper interpretation of the term "employee."

This mode of construction began to evolve shortly after the passage of the National Labor Relations Act. The Supreme Court found it necessary to restrict the literal definition of "employee" in order to preserve the intended Congressional definition of "employee." *NLRB v. Fansteel Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939). Congress sought to protect, through the National Labor Relations Act, only limited categories of employee conduct. The Court in *Fansteel* found that Congress included individuals "whose work has ceased as a consequence of, or in connection with, any current labor dispute" in the definition of employee or one central purpose: to insure that the Act's remedies—available only to "employees"—would be available to workers discharged for engaging in activity protected by the Act. The Court was unable to find any congressional intent to maintain the availability of the Act's remedies to workers discharged for activity which Congress had not sought to protect. Therefore, the Court reasoned, it would be inappropriate to conclude that these workers were "employees" even though their employment may have terminated in connection with a labor dispute.

■ This construction of "employee" is also necessary to harmonize the remedial provision of the Act with the Congressional intent to preserve an employer's right to discipline conduct not protected by the Act. By excluding various employee conduct from the protection of the Act, the *Fansteel* Court observed that Congress intended that the employer retain "normal rights of redress," including "in their most obvious scope . . . the right to discharge" employees for unprotected conduct. 306 U.S. at 254, 59 S.Ct. at 495. On the other hand, the Board is given substantial discretion in the reinstatement of "employees," and doctrines such as *Fleetwood* raise the presumption that the employer violates the Act for failure to grant reinstatement rights to employees. Thus by excluding workers who have been discharged for unprotected activity from the definition of "employee," the statutory anomaly of permitting the Board to find that an employer has committed an unfair labor practice by refusing to reinstate employees that Congress permitted the employer to discharge is substantially obviated. We therefore conclude in the circumstances of this case, that strikers properly discharged for unprotected activity were not "employees"; that the employer's nondiscriminatory refusal to reinstate such strikers did not violate the Act; and that the Board was not empowered to order their reinstatement.

The Board disputes this construction of the definition of "employee" and this interpretation of *Fansteel*. In this case, the Board upheld the administrative law judge's reasoning that *Fansteel* only excludes those individuals from the definition of employee who have been discharged for unlawful conduct. In *Fansteel* the Board sought to reinstate strikers who had been discharged for engaging in a sit down strike at the employer's plant. The Court concluded that Congress could not have intended to immunize from discharge those workers who engaged in a sit down strike—unlawful activity unprotected by the Act.

The Court did emphasize the unlawful nature of the sit down strike. The Board however misconstrues the Court's use of the unlawful circumstances of the strike. The Court did not conclude that, as a principle of construction, section 2(3) excludes workers who are discharged for unlawful activity from the definition of employee. This conclusion represented only an application of a broader principle and not the principle itself. The principle of interpretation employed was that Congress did not structure section 2(3) to immunize from discharge those workers who engaged in unprotected activity. The Court clearly phrased the principle, reasoning that when employees "took a position outside the protection of the statute and accepted the risk of the termination of their employment upon grounds aside from the exercise of the legal rights which the statute was designed to

conserve" the Board was powerless to re- new their employment status. 306 U.S. at 256–57, 59 S.Ct. at 496. The Court relied on the unlawful character of the strike to sup- port its conclusion that Congress would not have intended to include such conduct with- in the protection of the Act. The illegality of the conduct is only relevant to ascertain- ing whether the conduct is protected or unprotected under the Act. Since the Act is very general in describing protected ac- tivities, section 7, 29 U.S.C. § 157, this is often a difficult question. Once that inten- tion is derived, however, illegality would be irrelevant.

Despite the Board's rejection of these principles in this case, this is clearly the mode of construction which the Board has employed in a line of cases since *Fansteel*. The Board and the courts have concluded in a variety of circumstances that a discharge for activity not protected by the Act termi- nates employee status and precludes a find- ing that the employer has committed an unfair labor practice for refusal to rein- state. *Eggo Frozen Foods*, 209 N.L.R.B. 647 (1974) (activity of workers not "concert- ed"); *The Dow Chemical Co.*, 212 N.L.R.B. 333 (1974), *modified* 530 F.2d 266 (3d Cir. 1976), *cert. denied*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976) (termination for violation of no-strike clause results in loss of employee status); *Raleigh Water Heater Mfg. Co.*, 136 N.L.R.B. 76 (1962) (engaging in a slowdown); *Henning & Cheadle Inc. v. NLRB*, 522 F.2d 1050 (7th Cir. 1975). In *Acrylic Optics Corporation*, 222 N.L.R.B. 1105 (1976), the Board concluded that when a discharge does not violate the Act, "*it follows*, and we find, that [the employer] also did not violate . . . the Act by its refusal to reinstate [the employee] at the conclusion of the strike . . . . Follow- ing [the employer's] lawful non-discrimina- tory discharge, [the employee] lost her sta- tus as an 'employee'. . . ." *Id.* at 1106 (emphasis added).

In order to apply these principles to this case it is necessary to determine whether Congress intended that the Woodlawn em- ployees be immunized from discharge for their strike activity. Or conversely, it is helpful to determine whether Congress in- tended that Woodlawn Hospital be prohibit- ed from discharging the strikers. If not, then they would have lost their status as "employees" at the time of discharge and Woodlawn could not be held to have violat- ed the Act by its refusal to reinstate the strikers. It is clear that the Woodlawn employees, by striking prior to the effective date of the Health Care Amendments, en- gaged in conduct which Congress had de- clined to protect. Although the Labor Board construed the original Wagner Act to include nonprofit hospitals, in 1947 Con- gress specifically excluded health care insti- tutions from the coverage of the Act.[7] *Congress was of course aware that hospitals thereby retained the common-law right to discharge employees for union activity.* Therefore, prior to August 25, 1974, Con- gress had effectively preserved Woodlawn's right to discharge strikers. When the hos- pital employees walked off their jobs in 1972 they, like the employees in *Fansteel*, did so at their own risk and without the protection of the National Labor Relations Act. Accordingly, Woodlawn was entitled to discharge the strikers before August 25, 1974, since "[i]t is well established that an employer may discharge an employee for good reason, for bad reason, or for no rea- son, provided that it is not for a reason proscribed by the statute." *Acrylic Optics Corp.*, 222 N.L.R.B. 1105, 1106 (1976).

Unless Congress intended the Health Care Amendments to retroactively immu- nize employees discharged for strike activi- ty before the Act, we would therefore have to conclude that Congress did not intend to confer the status of "employee" on the dis- charged Woodlawn strikers since the strik- ers engaged in conduct not protected by the Act. However, a demonstration that the amendments were intended to be retroac-

---

7. See the discussion in *NLRB v. International Brotherhood of Electrical Workers Local 388*, 548 F.2d 704, 708 n. 8 (7th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977).

tive would supply the necessary Congressional intent to remove this case from the controlling effect of *Fansteel.*

■ The Board has not cited any authority to suggest that Congress wished to extend retroactive protection.[8] Nor are we aware of any such authority. The Act was enacted on July 26, 1974, with an effective date delayed until August 25, 1974. We have held in another context that the amendments were not intended to be retroactive. *Hospital Employees Labor Program v. Ridgeway Hospital,* 570 F.2d 167 (7th Cir. 1978). The Board has also so held. *Puerto Rico Labor Relations Board,* 217 N.L.R.B. 992 (1975). The very structure of the Act is prospective in nature. Congress extended protection to the health care workers only after carefully mapping out a required pattern of collective negotiation designed to preserve the continuity of patient care. Unlike workers in other industries, healthcare employees must serve a ten-day notice of a strike under section 8(g) in order to secure the protection of the Act. 29 U.S.C. § 158(g). This court observed in *NLRB v. International Brotherhood of Electrical Workers Local No. 388,* 548 F.2d 704 (7th Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977), that "Congress has made clear that as part of the price for giving to employees of health care institutions the benefits and protection of coverage under the National Labor Relations Act, unions representing such employees will have to serve ten-day's notice . . ." *Id.* at 712. Given this scheme of duties and benefits it seems reasonable to conclude that Congress did not intend to nullify retroactively employer discharges for union activity that was conducted without the safeguards for patient care which Congress found necessary. Thus, an effective discharge of health care employees prior to August 25, 1974 would terminate employee status and preclude the order of reinstatement by the Board.

We emphasize that this result does not leave Woodlawn free to discriminate against its discharged strikers on the basis of their union activity. Woodlawn would violate the Act by refusing to hire the former employees on discriminatory grounds relating to concerted employee activity. *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The administrative law judge, however, refused to find that the hospital did in fact discriminate in this manner. The order of reinstatement as to any employee effectively discharged cannot be enforced.[9]

### III

In order to apply these principles of reinstatement it is necessary to ascertain which of the strikers were effectively discharged. Although Congress preserved for healthcare employers the right to discharge employees before August 25, 1974, if they

---

8. The Board argues instead that no retroactive application is involved since the denial of reinstatement occurred after the effective date of the Act. Nonetheless the denial of reinstatement was only an unfair labor practice if the strikers were employees, and the strikers were only employees if their discharges were retroactively nullified. Since the order of reinstatement would clearly nullify the "legal effect of past events," *In re Reilly,* 442 F.2d 26, 28 (7th Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971), we think it must be characterized as retroactive. The Board itself held in *United States Postal Service,* 200 N.L.R.B. 413 (1972) that to assert jurisdiction over the complaint of a worker discharged before the effective date of the Act would be an impermissible retroactive application of the Act even though the worker applied for relief after the effective date.

9. We do not find persuasive the pre-Wagner Act case of *NLRB v. Carlisle Lumber Co.,* 94 F.2d 138 (9th Cir. 1937), *cert. denied,* 304 U.S. 575, 58 S.Ct. 1045, 82 L.Ed. 1539 (1938), relied upon by the Board to establish retroactive application. In *Carlisle* the court found that strikers who were discharged before the effective date of the Wagner Act were still "employees" under the Act. The case is not persuasive for several reasons. First, the court relied on Congressional intent to apply the protections retroactively, an intent notably missing here. Second, the court was reluctant to narrow in any regard the breadth of the definition of "employee", a result now permitted by *Fansteel.* Finally, the court believed that as mere applicants for employment the employer would be free to discriminate against them, a result subsequently foreclosed by the Supreme Court in *Phelps Dodge.*

failed to exercise those rights, status as an "employee" would not have terminated.

In order to effect a discharge, the employer must intend to terminate the employment and that intent must be communicated to the employee. *NLRB v. Comfort, Inc.,* 365 F.2d 867 (8th Cir. 1966); *Matlock Truck Body & Trailer Corp.,* 217 N.L.R.B. 346 (1975); *Methodist Hospital of Kentucky,* 227 N.L.R.B. 1392 (1977). A formal statement of discharge is not required but only "acts or words which show a clear intention on the part of the employer to dispense with the services of the employee and which are the equivalent to a declaration that the services will no longer be accepted." *Monroe v. Penn-Dixie Cement Corp.,* 335 F.Supp. 231, 233 (N.D.Ga.1971); *Taylor v. Tulsa Tribune Co.,* 136 F.2d 981, 983 (10th Cir. 1943).

The administrative law judge separated the employees into two categories in resolving the issue of discharge. In one category, she concluded that the 19 employees who received letters informing them that they were ineligible for reinstatement were discharged but that the discharge was later rescinded by the employer's acts of "condonation." The Board disclaimed reliance on this finding of condonation, reasoning that reinstatement rights attached irrespective of discharge. The second category of employees ordered reinstated were found never to have been effectively discharged. Although the reasoning is somewhat ambiguous, the administrative law judge apparently found that the employer never intended to discharge these employees.[10]

## A

Although we are reluctant to displace the administrative law judge's determination that this latter group was not discharged, a mixed question of fact and law, this conclusion is simply not supported by the record or by applicable precedents. As a matter of law, we think this record clearly establishes that the employer did *intend* to discharge the strikers before the effective date of the Health Care Amendments. Whether that intention was communicated is a separate question.

The administrative law judge found that the letters which requested employees to clean out their lockers were "tantamount to discharges in their wording. . . ." 233 N.L.R.B. No. 117 at 14. Nonetheless, the judge relied on several other facts to negate the inference that these letters demonstrated Woodlawn's intention to terminate the employees. First she found that the number of letters sent was limited to the number of lockers needed. More importantly, she concluded that the employer's offer of reinstatement on November 8, 1972, and the employer's willingness to negotiate the issue of reinstatement throughout the period of the dispute revealed that a discharge was never intended.

At the outset, it is clear from the Supreme Court's opinion in *Fansteel* that once a lawful discharge has been effected, the employer is free to reconsider that decision and to negotiate for reinstatement with discharged employees. 306 U.S. at 252, 259, 59 S.Ct. 490. If a discharge was intended by the August 4 letter, a willingness to offer reinstatement would not nullify the effect of the discharge as a matter of law.[11]

The judge, however, apparently relied on the settlement attempts as demonstrating a lack of intention to discharge the strikers. This is not a novel use of reinstatement offers, but it has been employed, and is appropriate, only in a very different factual setting. In the cases relied upon by the administrative law judge, the courts refused to find an unlawful discharge where the employer, despite initial language of discharge, either never permanently replaced the strikers, reinstated all those who agreed

---

**10.** It is possible to read the opinion as stating that Woodlawn's acts of negotiation rescinded the discharges as a matter of law. Since, as discussed, this position is unsupportable, we read the opinion instead as invoking these subsequent acts as evidence of intention.

**11.** The doctrine of condonation can under some circumstances operate to nullify an effective discharge, but as discussed *infra,* this doctrine is inapplicable here.

to return, or both. *See NLRB v. European Cars Ypsilanti, Inc.,* 324 F.2d 606 (6th Cir.); *Shopmen's Local Union No. 733 v. NLRB,* 219 F.2d 874 (6th Cir.), *cert. denied,* 350 U.S. 835, 76 S.Ct. 70, 100 L.Ed. 745 (1955); *NLRB v. Associated Wholesale Grocery of Dallas, Inc.,* 262 F.2d 281 (5th Cir.); *Matlock Truck Body & Trailer Corp.,* 217 N.L.R.B. 346 (1975); *Maxville Stone Co.,* 166 N.L.R.B. 888 (1967); *Crookston Times Printing Co.,* 125 N.L.R.B. 304 (1959). The standard employed requires the Board to demonstrate that the employer actually intended to "impair the protected status of the striking employees" to prove an unfair labor practice charge for unlawful discharge. *Shopmen's Local Union No. 733 v. NLRB,* 219 F.2d 874, 876 (6th Cir.), *cert. denied,* 350 U.S. 835, 76 S.Ct. 70, 100 L.Ed. 745 (1955).

We think, however, that the record leaves no doubt that Woodlawn intended to impair the strikers' status as employees. First, it is undisputed that replacements were hired promptly after the strike and that they were assured that they were permanent. In *Filler Products Inc. v. NLRB,* 376 F.2d 369, 378 n.3 (4th Cir. 1967), the court reiterated that "[o]ne of the established ways to determine in disputed cases when an employee is discharged is to ascertain when he was replaced." Second, although the record shows that Woodlawn did offer reinstatement to the majority of strikers in November of 1972, the record also reveals that the offer was limited and only intended to stand open for a 30 day period ending on December 8, 1972.[12] The judge relied on the settlement negotiations but the fact is that the hospital broke off the negotiations and refused to tender an offer of reinstatement. When the union formally informed Woodlawn that reinstatement would be sought after the effective date of the Act, Woodlawn replied that "permanent replacements have filled the job vacancies which resulted from the work stoppage" but assured them they would fairly process applications for employment. Thus, the limited offer of reinstatement cannot be extended beyond its own terms to find any intent not to discharge the strikers. Finally and most importantly, the fact that the employer refused to reinstate all but three of the strikers who applied reveals indisputably an intention to impair their employee status. The employer's actions in this case simply do not belie their words. The 30 day offer of reinstatement and settlement negotiations cannot be used to establish an absence of intention to discharge but only a conditional willingness to reconsider its decision. As the Supreme Court concluded in *Fansteel,* the hospital was "free . . . to offer reemployment if it chose." 306 U.S. at 259, 59 S.Ct. at 498.

Whether the employer effectively communicated the intention to all employees ordered reinstated is a more difficult question. Again it is well-settled that the announcement needs no special form to be effective, it simply must be communicated. In *Fansteel* for example, the Supreme Court held that announcing "in loud tones" to the sit down strikers that they were all fired was an effective discharge. 306 U.S. at 249, 252, 59 S.Ct. 490. However the Board stipulated, and the Court found that the strikers who were not in the building at the time of the announcement were not "within the announcement of discharge."

---

12. The letter offering reinstatement read:

The hospital is happy to offer you your job without prejudice to any earned but unused benefits. To the extent of existing vacancies reinstatement will be immediate; otherwise it will take place within 30 days.

. . . If you desire to apply for reinstatement, you should bring this letter with you to the Personnel Office of the hospital between the hours of 9 A.M. and 5 P.M. Monday through Friday.

Although the letter does not state unambiguously that a request for reinstatement must be made within 30 days, an internal hospital memorandum for personnel employees entitled "Guidelines for Reinstatement of Striking Employees" makes that limitation clear. Paragraph 5 of the guidelines reads: "Termination of Invitation for Reinstatement: . . . If an employee offered reinstatement applies after December 8, 1972 then he cannot be reinstated."

306 U.S. at 259, 59 S.Ct. 490.[13] The requirement of communication may in some circumstances seem formalistic. Nonetheless, if an employer seeks to obtain the legal benefits of discharge then it should be incumbent upon him to clearly inform the workers of their discharge. This seems reasonable whether viewed as a requirement derived from contract or employment-relations principles.

The "locker" letters sent on August 4 clearly communicated to the employees that they had been discharged: "Inasmuch as you have resigned your employment in accordance with published personnel policies of Woodlawn Hospital, the hospital has found it necessary to permanently replace you." Similar language was found effective in *NLRB v. Comfort, Inc.*, 365 F.2d 867 (8th Cir. 1966). The difficulty presented however is that apparently not all the strikers received these letters. The administrative law judge found that between 34 and 50 of the strikers received the letters but that the "precise number and identity of these strikers do not appear." The judge also found that the discharge may have been communicated to others as well since "most of the strikers attended at least some of [the] fact-finding hearings, at which Respondent apparently made clear its position that the strikers had resigned, pursuant to the resignation rule in the personnel manual." 233 NLRB No. 117 at 12. The issue of who received effective notice was not resolved by the judge since it was unnecessary to her decision. Since these two events, the "locker" letter and the announcement at the hearings, constitute the only efforts to inform the employees of their termination,[14] we find it necessary to remand to the Board to determine who was informed of their discharge by the employer.

**13.** It is not clear whether the Board and Court believed that there had been no effective discharge of these men because they were not inside the building to hear it, or merely because they were not included in the announced category of those discharged: sit down strikers. We construe it as a failure in both respects.

B

The record evidences, and the administrative law judge found, that 19 of the employees were discharged by the letter of August 4 informing them that they were ineligible for reinstatement. The ALJ concluded, nonetheless, that under the doctrine of "condonation," the employer rescinded the discharge. In affirming the ALJ, the Board ordered the reinstatement of these 19 employees but found it "unnecessary to rely on the finding of the Administrative Law Judge that the Respondent, by the position it took in settlement negotiations, rescinded its discharge of the striking employees." 233 NLRB No. 117 at 2 n.2. Since we find that discharged employees are not entitled to reinstatement it is necessary to determine whether the ALJ properly concluded that the discharges were nullified by the acts of condonation. We conclude that none of Woodlawn's actions constitute condonation of any otherwise effective discharges.

Condonation is a doctrine developed by the Board, and occasionally invoked by the courts, whereby an employer is deemed to have rescinded an otherwise lawful discharge, thereby preserving a worker's "employee" status. As stated in *NLRB v. Colonial Press, Inc.*, 509 F.2d 850, 854 (8th Cir.), *cert. denied*, 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975),

> The principle of waiver by condonation used in the context of labor relations is that, if after an employee commits acts of misconduct lawfully justifying his discharge, and thereafter the employer, fully cognizant of the acts, agrees not to discipline him, the employer may not thereafter rely on the same misconduct as the basis for discharging or refusing to reinstate the employee.

**14.** As discussed in note 9 *supra* we do not believe that the letters offering reinstatement were sufficiently precise to constitute communication of termination. Internal record-keeping actions which evidenced intent to terminate also are of no help to Woodlawn. Nor do we find that the August 22, 1974 letter to the Union advising that strikers must submit applications for new employment constitutes effective individual notice of termination.

This case satisfies neither the prerequisites nor the rationale for applying the condonation doctrine.

One branch of the condonation doctrine requires an employer to honor "employee" rights if the employer had reached a settlement with the union reinstating those that had previously been lawfully discharged. *Jones & McKnight, Inc. v. NLRB*, 445 F.2d 97 (7th Cir. 1971). In *Jones & McKnight* this court found that "[t]he primary purpose of the Act is to further industrial peace, and effectuation of this statutory policy demands that parties to a strike settlement be precluded from going behind their agreement to reopen a matter which they have waived in the interests of peace and harmony." *Id.* at 103. Although Woodlawn negotiated the question of reinstatement, no final settlement on the issue was ever reached. Thus the *Jones & McKnight* rationale is inapposite.

Another branch of the doctrine has found condonation where an employer has clearly indicated "forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred." *NLRB v. Marshall Car Wheel & Foundry Co.*, 218 F.2d 409, 414 (5th Cir. 1955). Courts have emphasized however that an offer of reinstatement is not condonation unless accompanied by a clear expression of forgiveness. *NLRB v. Colonial Press, Inc.*, 509 F.2d 850, 854 (8th Cir.), *cert. denied*, 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975); *Retail, Wholesale and Department Store Union v. NLRB*, 151 U.S.App.D.C. 209, 215 n.13, 466 F.2d 380, 386 n.13 (1972); *NLRB v. Community Motor Bus Co.*, 439 F.2d 965, 967–68 (4th Cir. 1971). Woodlawn's letter of November 8, 1972, which the ALJ found as the source of condonation, includes absolutely no statements of this variety. Nor are we aware of any such evidence in the record. Furthermore, the Fourth Circuit in *Community Motor Bus Co.* refused to find condonation where the employer's offer of reinstatement was not accepted. The court

found that after the offer was made, "the invitation was rejected. The men continued to strike for another week. In such a case, a spurned offer, which is never renewed, does not forever waive the employer's right to refuse reinstatement for cause." 439 F.2d at 968. The Eighth Circuit in *Colonial Press* also held that the employee must have accepted the offer of reinstatement. 509 F.2d at 855. Woodlawn's offer of reinstatement was not accepted and was in fact conditional on acceptance within 30 days.

■ Finally, we find that this branch of the condonation doctrine is simply inapplicable to pre-Act discharges.[15] The ALJ relied on the Board's reasoning in *Colonial Press* that condonation is appropriate where it may be inferred that the employer discharged the worker for impermissible reasons on the pretense of permissible ones:

> [W]hen the employer, by his statements or conduct, evidences a lack of genuine concern about such misconduct by forgiving it or by offering reemployment despite the prior misconduct, we will not permit him subsequently to reassert the condoned conduct as a basis for refusing reemployment. For, once he has indicated that the misconduct on which he relied for severing the employment relationship is no longer his true reason for denying reemployment to those who have protested his unlawful acts, there can remain only the discriminatory reason for denying such reemployment—*i. e.*, retaliation against such persons for having struck or picketed in protest against the employer's unlawful interference with employee rights.

*Colonial Press, Inc.*, 207 N.L.R.B. 673, 674, *enforcement denied in part*, 509 F.2d 850 (8th Cir.), *cert. denied*, 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975). In this case there is no need to invoke a doctrine designed to ferret out discharges motivated by anti-union sentiments. Woodlawn's motivations for the discharge are irrelevant. As dis-

---

15. If Woodlawn had reached a final settlement with the union the rationale of the other branch would be applicable.

cussed, they were entitled to discharge the workers for union activity and that principle would be unaltered even if they had forgiven these actions. Woodlawn's discharges were not rescinded.

## IV

Since it may be found on remand that some of the workers were never informed of their discharge, it is necessary to address the propriety of reinstating those Woodlawn strikers who were never discharged. Several questions must be answered to determine whether their reinstatement was proper. It must be determined whether these strikers were "employees" when they applied for reinstatement; whether Woodlawn committed an unfair labor practice by refusing to grant them preferential reinstatement rights; and whether the Board properly exercised its remedial discretion in ordering reinstatement.

■ We conclude that the Woodlawn strikers not effectively discharged were § 2(3) employees on the date they requested reinstatement. This conclusion derives support from the Supreme Court reasoning in *Fansteel*. When an employee engages in conduct not protected by Congress, as the Woodlawn strikers did, the workers do not automatically lose their right to the Act's protections. They lose their employee status, and the protection that status confers, only if the employer discharges the striker for that conduct. The *Fansteel* opinion infers that Congress did not intend to totally preclude an employee from the Act's protection once he has engaged in conduct which, although unprotected, did not provoke the employer to invoke his rights to discharge. Therefore, absent discharge, strikers are still "employees" even though they may have engaged in unprotected activity. Whether an employer is required to reinstate such an employee is a question independent of the definition of "employee."

Application of this reasoning to the Woodlawn strikers is complicated by the inclusion of sections 8(d) and 8(g) in the Health Care Amendments. Section 8(g) requires a health care union to serve ten-day advance notice to the employer "before engaging in any strike, picketing, or other concerted refusal to work." 29 U.S.C. § 158(g). Failure to provide this notice triggers section 8(d) which mandates that an employee who strikes without notice "shall lose his status as an employee" under the Act. 29 U.S.C. § 158(d).

■ These sections pose the obvious question of whether section 8(d) terminates the "employee" status of the Woodlawn strikers, who went on strike in 1972 without notice and who failed to give ten-day notice prior to the effective date of the Act. At the outset we emphasize that in analyzing the import of section 8(d) it is important to keep distinct two separate expressions of intention. Section 8(d) manifests both an intention that strikes without notice be unprotected and that certain strikers who engage in this conduct lose employee status. But, as *Fansteel* emphasizes, these are separate questions. Although section 8(d) makes it quite clear that strikes without notice are not within the protection of the Act, that expression of intent is not dispositive of the question of whether employees who engage in such conduct, but are not discharged, lose their employee status. As in *Fansteel*, although Congress did not intend to protect unlawful activity, workers who engaged in unlawful activity remained employees under the Act unless they were discharged. Thus the focus in analyzing the impact of section 8(d) must be to determine whether particular workers who have engaged in strikes without notice fall within the category of strikers Congress intended to automatically strip of employee status irrespective of discharge.

Section 8(d) can be variously construed to automatically terminate the employee status of three different categories of strikers. It can be argued that section 8(d) expresses a congressional intention that any worker continuing in strike activity beyond the effective date of the Act, even if commenced prior to the Act, had to interrupt the strike and give notice to preserve "employee" status. Or it can also be viewed as a retroac-

tive requirement that precludes employee status for any worker who engaged in a no-notice strike prior to the effective date of the Act. The Board, however, reads the provision as altering the employee status only of those workers who commence a strike without notice after the effective date of the Act. *Methodist Hospital of Kentucky, Inc.,* 221 N.L.R.B. 692 (1975).

In *Methodist Hospital,* the Board focused on whether the Act required employees to interrupt an ongoing strike on August 25, 1974 to give statutory notice. The General Counsel had initially published guidelines which advised strikers of the necessity of such an interruption. The Board's rejection of the General Counsel's construction seems eminently reasonable. The purpose of 8(g) is quite clearly to provide advance notice to employers so that they may prepare for the continuity of health care during the strike. S.Rep.No.766, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 3948. Notice of a strike that had been ongoing for more than two years on the effective date of the Act would not further the purposes that section 8(g) was designed to foster and thus should not be read as a prerequisite to a strike in progress on the Act's effective date.

We find it somewhat more difficult to ascertain whether Congress intended section 8(d) to terminate the employee status of workers who commenced a strike without notice prior to the effective date of the Act. The Board, however, implicitly resolved it in *Methodist Hospital* by concluding that the notice requirement "is not applicable where the strike or other activity began prior to the effective date of the hospital amendments." 221 N.L.R.B. at 692. The Board reasoned that the language of section 8(g) "can fairly be read only as contemplating activity commencing after the effective date of the hospital amendments." *Id.* at 692–93. Although we defer to the Board's interpretation we do not think that it is frivolous to maintain that Congress intended that workers who engaged in no-notice strikes prior to the effective date of the Act lose employee status. Unlike the determination that Congress

would not have intended to deny protection to strikers who failed to interrupt an ongoing strike to give meaningless notice we cannot conclude that excluding workers who struck without notice would be similarly meaningless. After all, it has been noted that Congress was only willing to extend protection on this conditional basis. See *NLRB v. IBEW Local 388,* 548 F.2d 704 (7th Cir.) *cert. denied,* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977).

Nonetheless, we accept the Board's interpretation and conclude that Congress left the regulation of pre-Act employee conduct to the employer. Thus if the employer did not discharge the employee for engaging in a no-notice strike, then Congress did not intend to disturb that inaction. After the effective date however, no-notice strikers may lose their "employee" status without regard to employer action.

This construction seems most consistent with the attempt to make the regulatory scheme of the Health Care Amendments wholly prospective. Just as we do not believe that Congress intended to retroactively strip employers of their pre-Act remedies, we conclude that Congress did not intend to reserve protection only to those workers who could have foreseen in 1972 the notice requirements that would be imposed by the Act. The notice provisions have a well-defined purpose in the Act, but we do not believe part of that purpose is to penalize employees that were unencumbered by that requirement at the time they engaged in concerted activity. The Woodlawn employees never disregarded a Congressional mandate. The hospital, and not Congress, effectively controlled their status as employees when they commenced their strike. Since the hospital may have failed to effectively discharge them for this conduct we are unwilling to conclude that Congress has retroactively barred them from the Act's protections.

We also uphold the Board's determination that Woodlawn's refusal to reinstate the strikers who were not discharged is an unfair labor practice. The refusal to reinstate

striking employees is not always an unfair labor practice. In *Fansteel*, for example, the Court found that the employer did not violate the Act for refusing to reinstate employees who had engaged in unlawful conduct even though they had not been previously discharged. However, *Fleetwood* established the presumption that the refusal to grant reinstatement rights to striking employees violates the Act unless the employer can demonstrate that reinstatement rights were denied for "legitimate and substantial business justifications." Strike misconduct, as in *Fansteel*, can support an employer's denial of reinstatement. It appears however that those employees who may have engaged in serious misconduct were among the 19 employees clearly discharged and thus are not within the category of employees eligible for reinstatement.

All the strikers however were guilty of striking without notice. The board apparently does not believe that this was the variety of misconduct which should constitute a substantial business justification for refusal to reinstate. The record also does not demonstrate that the employer attempted to rely on this ground. We therefore must conclude that the Board's determination that the employer failed to meet the burden of demonstrating any substantial business justification is supported by substantial evidence.

Since the board concluded that the employer did not have good cause for denying reinstatement, it would appear axiomatic that the Board's order of reinstatement "effectuated the policies of the Act," thus constituting a proper exercise of its section 10(c) remedial powers. We therefore reverse the Board's order reinstating the 19 employees who received effective notice of their termination in the November 8, 1972 letter informing them of their ineligibility for reinstatement. We also must remand the case for a determination of which of the other workers were informed of their discharge by Woodlawn, denying reinstatement to those who were so informed and affirming the order of reinstatement to those who were not.[16] We also vacate for further consideration the order of the Board requiring Woodlawn to accord full accrued benefits to the strikers who were reinstated.[17]

16. On remand, we do not believe that the Board must shift to the General Counsel the burden of proving that the strikers have not obtained equivalent employment, as the hospital urges. See *Duncan Foundry and Machines Works, Inc.*, 176 N.L.R.B. 263, 271 (1969), *enforced* 435 F.2d 612 (7th Cir. 1970); *Little Rock Airmotive, Inc.*, 182 N.L.R.B. 666, 672 (1970), *enforced in part*, 455 F.2d 163 (8th Cir. 1972). *Cf. Bio-Science Laboratories v. NLRB*, 542 F.2d 505, 508 (9th Cir. 1976). Nor do we believe that the Board abused its discretion by failing to grant

the hospital's subpoena of striker questionnaires in the Board's possession. The denial was based on the Board's established discovery limitations. *See, e. g., NLRB v. Vapor Blast Manufacturing Co.*, 287 F.2d 402, 405–08 (7th Cir. 1961), *cert. denied*, 368 U.S. 823, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961). The hospital has failed to support any claim of prejudice.

17. Similarly, it would appear that this adjustment is only required if the three employees rehired had never been discharged.