METHODIST HOSPITAL OF KENTUCKY, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Communication Workers of America, AFL–CIO, Intervenor.

No. 77–1057.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 7, 1979.

Decided March 20, 1980.

---

James U. Smith, Jr., Louis E. Woolery, Smith & Smith, Louisville, Ky., Henry D. Stratton, Stratton, May & Hays, Pikeville, Ky., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Marion Griffin, Candace M. Carroll, N. L. R. B., Washington, D. C., Joan H. Rosenzweig, Edward C. Verst, Region 9, N. L. R. B., Cincinnati, Ohio, for respondent.

Before EDWARDS, Chief Circuit Judge, and ENGEL and MERRITT, Circuit Judges.

ENGEL, Circuit Judge.

The Board orders we review here are the product of a labor dispute which com-

menced on June 10, 1972, when employees of petitioner Methodist Hospital of Kentucky, Inc., went on strike to obtain recognition of the intervening union, Communication Workers of America, AFL–CIO. Prior to August 25, 1974, non-profit hospitals did not come within the jurisdiction of the NLRB since they were specifically excluded from the definition of "employer" under Section 2(2) of the National Labor Relations Act. The strike was still in effect when congressional amendments to the Act, effective on August 24, 1974, removed the Section 2(2) exemption, thereby conferring the protections of the Act upon non-profit health care institution employees.

The strike was discontinued by the union on October 10, 1974. In the meantime, despite inconvenience at the outset and a reduction in certain services, the hospital had remained open, largely through the efforts of new employees hired to replace the strikers. The hospital, however, refused the union's request to reinstate the approximately 200 non-professional employees to their former positions or to accept them as applicants for employment.

In decisions reported at 221 NLRB No. 87 (1975) and 227 NLRB No. 189 (1977) the Board upheld most of the administrative law judge's findings, and determined that the hospital had violated Sections 8(a)(1) and (3) of the Act by: (1) refusing to reinstate strikers to their former positions as vacancies arose after October 10, 1974, the effective date of the union's request for reinstatement, and (2) refusing to hire the strikers as new employees without regard to their former union activity. In addition to the usual cease and desist provision, the Board order affirmatively required the hospital to reinstate the strikers to their former positions without prejudice to seniority and other rights and privileges, and to make them whole for any earnings lost by virtue of the hospital's discrimination.

The additional circumstances, with regard to the cross-petitions for review and enforcement, will be described as they pertain to the issues raised.

## I.

The 1974 Health Care Amendments, specifically Section 8(g), 29 U.S.C. § 158(g), provide that before a labor union initiates a strike against a health care institution it shall give at least ten days prior notice in writing to the employer and the Federal Mediation and Conciliation Service.[1] Further, under Section 8(d) of the Act, 29 U.S.C. § 158(d), any employee who engages in a strike in violation of the ten-day waiting period forfeits, for most purposes, the protections accorded striking employees under the Act.[2]

It is undisputed that no notice was given of the strike, either as its onset or after the effective date of the amendments. The company urges that the notice requirements of Section 8(g) applied to strikes in progress on the effective date of the amendments, and that to avoid the forfeiture of employee status under Section 8(d) the strikers were required to cease their ongoing activities, serve the appropriate notices and wait ten days before resuming the strike. On this

---

1. Section 8(g) of the Act, 29 U.S.C. § 158(g) provides:

   A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of subsection (d) of this section. The notice shall state the date and time that such action will com-

   mence. The notice, once given, may be extended by the written agreement of both parties.

2. Section 8(d) of the Act, 29 U.S.C. § 158(d) provides:

   Any employee . . . who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer.

**566**

basis it is asserted that the Board had no power to order the reinstatement of striking employees or otherwise intervene in the labor dispute.

While the General Counsel had originally agreed with the company's contention, see 221 NLRB No. 87 at 692–93, the Board reached a contrary conclusion, determining that since the strike began before the effective date of the hospital amendments, "The Health Care institution is already possessed of actual notice and continuity of patient care cannot be further provided for by requiring additional notice." We agree with the Board and with the analysis of this issue in *Woodlawn Hospital v. NLRB*, 596 F.2d 1330, 1342–44 (7th Cir. 1979), where the Seventh Circuit, citing the Board's decision here, observed:

> In *Methodist Hospital*, the Board focused on whether the Act required employees to interrupt an ongoing strike on August 25, 1974 to give statutory notice. The General Counsel had initially published guidelines which advised strikers of the necessity of such an interruption. The Board's rejection of the General Counsel's construction seems eminently reasonable. The purpose of 8(g) is quite clearly to provide advance notice to employers so that they may prepare for the continuity of health care during the strike. S.Rep.No.766, 93d Cong., 2d Sess., *reprinted* in [1974] U.S.Code Cong. & Ad. News 3948. Notice of a strike that had been ongoing for more than two years on the effective date of the Act would not further the purposes that section 8(g) was designed to foster and thus should not be read as a prerequisite to a strike in progress on the Act's effective date.

We believe that this circuit's position was clearly foreshadowed by our earlier enforcement of the Board's decision in *Grand Lodge of Free and Accepted Masons*, 220 NLRB No. 226 (1975), *enforced*, 548 F.2d 1276 (6th Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 66, 54 L.Ed.2d 79 (1977). There the employer was not a hospital but a non-profit nursing home that had been struck by its employees in February, 1970, prior to the Board's assertion of jurisdiction over such institutions.[3] Since a bargaining agreement was in effect, Section 8(d) required the union to give a pre-strike notice to the Federal Mediation and Conciliation Service 30 days prior to the commencement of a strike when a party to the agreement sought to terminate or modify it. However, no such notice was served before the strike nor after June 2, 1970 when the Board first asserted jurisdiction over the industry. In those circumstances the Board rejected the employer's claim that failure to provide the requisite notice after jurisdiction was asserted rendered the strike illegal *ab initio*. 220 NLRB at 1319.[4] If not identical, the circumstances in *Grand Lodge* are strongly analogous to those here, and the logic applied is equally persuasive.

Therefore, contrary to the company's assertion, we conclude that any rights which the hospital's striking employees have under the Act were not affected by the failure to give the ten-day statutory notice, either before commencement of the strike, or after the effective date of the health care amendments.

## II.

■■ The hospital claims that it is justified in refusing to reinstate or rehire the striking employees because the strike was accompanied by acts of violence and other misconduct so egregious that the union lost

---

**3.** The Board first determined to exercise jurisdiction over non-profit nursing homes in *Drexel Home, Inc.*, 182 NLRB No. 1045 (1970), decided June 2, 1970.

**4.** Methodist Hospital correctly points to the difference in circumstances between these two cases and further observes that in *Grand Lodge* the employer asserted that Section 8(d)(3) of the Act should have been applied retroactively to the union before the Board asserted jurisdiction over the industry. This is, of course, true. However, the hospital fails to note that in *Grand Lodge*, the Board expressly rejected the employer's claim that, under those circumstances, the union was obligated to call off the strike and proceed in accordance with the provisions of Section 8(d), once jurisdiction was established. 220 NLRB at 1319.

any right to bargain collectively on behalf of the employees, and that the employees themselves had forfeited any right to reemployment. Our review of the record confirms the hospital's claim that there was substantial evidence of violence and misconduct in connection with the strike. The activity complained of included bomb threats, disruption of the telephone lines from the hospital, explosions on hospital property, the throwing of gasoline on property from which fires were started, mass demonstrations upon the hospital and other acts which can only be characterized as violent, unlawful and unprotected activity. The difficulty, however, is that the proofs fail to identify any particular miscreant and the hospital has specifically declined to offer such proof. Instead, the hospital relies upon unattributed acts of misconduct as its basis for refusing to deal with the striking employees.[5]

The hospital rightfully asserts that in enacting the National Labor Relations Act Congress never intended to compel employers to retain persons whose conduct goes beyond mere protected activity under the Act and extends to unlawful acts of trespass and violence against the employer's property.[6] While we would have no difficulty upholding a company decision to refuse employment to any person who was shown to have participated in the more egregious forms of unlawful conduct shown by the proofs here, it is clear that the company has specifically declined to attribute any specific act to any specific employee, preferring to rely upon general allegations of misconduct. At the same time we are unwilling upon these proofs to disturb the well settled rule in our circuit that the vicarious imposition of sanctions for violence will not be enforced absent proof that a particular individual was engaged in the unprotected activity. *See NLRB v. Deena Artware, Inc.,* 198 F.2d 645 (6th Cir. 1952), *cert. denied,* 345 U.S. 906, 73 S.Ct. 644, 97

L.Ed. 1342 (1953) (and cases cited at 198 F.2d 652). *Accord, NLRB v. Cambria Clay Products Co.,* 215 F.2d 48, 53 (6th Cir. 1954); *Kayser-Roth Hosiery Co. v. NLRB,* 447 F.2d 396 (6th Cir. 1971).

The hospital particularly urges us to follow *Johns-Manville Products Corp. v. NLRB,* 557 F.2d 1126 (5th Cir. 1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978), where it was held that unattributed acts of sabotage by employees during the bargaining process amounted to an in-plant strike which justified a lockout by the employer and the hiring of permanent replacements. It is notable, however, that the conduct complained of in *Johns-Manville v. NLRB* resulted in the complete shutdown of the plant, whereas here the hospital was able to hire replacement employees and remain in operation. Further, we have not been persuaded that the facts here would justify the abandonment of our long-held concept of accountability in labor disputes, especially since we believe these problems are better overcome by diligent investigation and honest fact-finding processes. Experience has shown that much difficulty can be caused by only a few individuals. Often those few may be only tangentially connected with the strike, if they are connected at all. Finally, in many instances, striking employees themselves abhor and are ashamed of these activities and ought not bear the resulting stigma. On the whole, therefore, we strongly favor the existing law of this circuit.

### III.

■ Even though it did not prove individual responsibility for the violence, the hospital still urges that its refusal to reinstate or rehire the striking workers is justified by what it claims was their heartless act of striking the hospital without notice, thereby placing that institution in a position wherein the lives and health of patients in

---

5. The record shows in General Counsel's Exhibit 9 that 37 striking employees were in fact accepted for re-employment. Their rights are not involved here.

6. *See, e. g., NLRB v. Fansteel Metallurgical Corp.,* 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939); *Raleigh Water Heater Mfg. Co.,* 136 NLRB 76 (1962); *Acrylic Optics Corp.,* 222 NLRB No. 166 (1976).

its care were seriously endangered. In this respect, however, we agree with the administrative law judge that the hospital's claim of surprise at the walkout was substantially overstated. Further, since the hospital does not specifically refute the administrative law judge's findings of fact with respect to those circumstances, we must accept them.

The administrative law judge found that the strike had long been anticipated. On May 31, 1972, the hospital had posted a letter signed by the President of the Board, expressing the hospital's opposition to the representation of its employees by the union and notifying those employees that the hospital was steadfastly refusing to recognize the union. At that time the hospital notified the employees that those "who decline to work will be considered as having resigned from their positions and replacements will be sought . . .. Those participating in [picketing] activities and not working, would necessarily be considered as having withdrawn from their employment with this institution." On June 9, 1972, Hospital Administrator Keene discharged the admissions clerk Arnold D. Coleman for soliciting employees to sign union authorization cards. Earlier on that day Achilles Williams was also discharged for his union activity. It is apparent that the company knew that a strike was brewing for at least several days prior to its actual occurrence and, in fact, rebuffed an eleventh hour union request to sit down and discuss the issues and thus avoid the strike.

The administrative law judge, while acknowledging that the strike had caused "serious inconvenience," nevertheless also determined that the company had exaggerated the impact of the strike. In particular he found that the intensive care unit remained closed after the strike due to a lack of professional employees, who had not joined in the strike, and not, as stated by company witnesses, because of the strike activity. Since neither the employees nor the company was subject to the jurisdiction of the Board under the Act at the time the strike commenced, the notice and waiting period was not applicable. Research has failed to disclose any duty under Kentucky law that would require notice or a waiting period before striking. Under these circumstances we are unwilling to disturb the administrative law judge's findings that the walkout itself was not such misconduct as would disqualify any striker for reinstatement or new employment. In summary, therefore, neither the walkout nor the conduct of the strikers or the union was sufficient to justify the company's refusal to consider individual striking employees for subsequent reinstatement or employment on a new-hire basis.

## IV.

In ordering the hospital to reinstate the strikers to their former positions the administrative law judge held that the strikers were not effectively discharged until they were denied reinstatement in October, 1974, two months after the health care amendments became effective. On its part the hospital vigorously asserts that the strikers were terminated on June 12, 1972, when they initiated the strike. The Board's decision brought the workers within the protection of the Act and was based, in part, upon the administrative law judge's finding that the hospital had failed to personally communicate its attempt to discharge the strikers prior to October, 1974. Simply put, this finding completely ignores the record.

The administrative law judge also ruled that even if the hospital had given adequate notice of termination to the strikers, their rights to reinstatement would not be affected because they would occur as a result of, or in connection with, a current labor dispute. It was his logic that since a recognition strike was in progress at the time the Board assumed jurisdiction over labor disputes involving non-profit health care institutions, the strikers remained employees under Section 2(3) of the Act and were entitled to reinstatement notwithstanding any actual effort to replace them by the company.

The Board based its adoption of the administrative law judge's rulings on a construction of a letter dated November 12,

1974, from the union to the hospital as requesting reinstatement and making application for new employment on behalf of all strikers not then employed.[7] Further, it was held that the letter was "clearly and unambiguously a request for new employment on behalf of all strikers" who were "thus entitled to non-discriminatory consideration of their employment applications on and after November 12, 1974, or an earlier date if an individual application was filed."

Our review of the administrative law judge's determination that the striking employees had not been terminated prior to the effective date of Board jurisdiction convinces us that this finding was not supported by substantial evidence.

The administrative law judge found that the hospital had not effectively terminated the strikers prior to the effective date of the amendments because it had failed to communicate the fact of discharge to the strikers.[8] Although the administrative law judge framed the issue to be whether the employees had been discharged prior to the effective dates of the amendments under Kentucky common law, the decision was supported by federal rather than Kentucky law.[9] Further, the administrative law judge relied upon the holding in *Percival v.*

---

7. The letter stated:

Since I sent you a letter dated October 7, 1974, many of the former strikers have been to the hospital and made application for employment on the standard application for employment form provided by the hospital. Others have obtained an application for employment form and mailed it to the hospital pursuant to instructions from the hospital's personnel department or the lady occupying the information booth in the lobby of the hospital.

These former strikers desire employment with the hospital in their former jobs and it is my opinion that you are obligated to place them back on their former jobs; however, if you will not place them back on their former jobs at this time because you contend that no vacancies exist the former strikers seek employment to their former jobs or any other jobs, which they are qualified to fill, at any time in the future when vacancies occur on their former jobs or any other jobs.

Each former striker on his or her application for employment has indicated his or her address and the former strikers expect to be employed in the future when job vacancies occur.

The application for employment filed by each former striker is a continuing offer and each individual desires to be employed whether you see fit to employ any other former striker or strikers.

8. The administrative law judge stated:

Hospital Administrator Keene testified that the employees who left their jobs to join the strike were terminated in accordance with the automatic operation of (1) the "Resignations" provision in its "Personnel Policies" booklet, quoted above, and (2) its May 31, 1972, notice to employees that those who participate in a strike will be considered as having resigned from their positions and replacements will be sought to fill their jobs. However, contrary to Respondent, neither communication served to effect the discharge of the striking employees. The provision regarding resignations in the Hospital's "Personnel Policies" booklet by its terms relates only to resignations and has no applicability to strikes and the May 31, 1972, letter was prospective in operation in that it merely advised employees that if they joined a strike replacements would be sought as the Hospital would consider that they had resigned from their jobs. I am acquainted with no case and none have been cited to me that holds that any such notice constitutes an operative discharge of employees. Hospital Administrator, Keene, also testified that a "Notice of Termination of Employment" was placed in the personnel folder of each striking employee. However, the affected employees were not advised of this fact nor were they otherwise informed that they had been terminated. In order to terminate an employment relationship there must be not only an intention on the part of the employer to abrogate the employment relationship but also some communication of that intent to the employee. Thus, as the Supreme Court of California pointed out in *Percival v. National Drama Corporation,* 181 Cal. 631, 637, 185 P. 972, 974 (1919), "A discharge cannot be effected by a secret, undisclosed intention on the part of the master. It must be done by some word or act communicated to the servant." I find, therefore, the Respondent had not discharged the striking employees prior to the date as of which application for their reinstatement was made. (footnotes omitted)

9. The administrative law judge ruled upon a series of early decisions under the Wagner Act and rulings of this court in *Shopmen's Local Union No. 733 v. NLRB,* 219 F.2d 874 (6th Cir.), *cert. denied,* 350 U.S. 835, 76 S.Ct. 70, 100 L.Ed. 745 (1955), and *NLRB v. European Cars Ypsilanti, Inc.,* 324 F.2d 606 (6th Cir. 1963),

**570**

*National Drama Corp.*, 181 Cal. 631, 637, 185 P. 972, 974 (1919), wherein the California Supreme Court determined that "a discharge cannot be effected by a secret, undisclosed intention on the part of the master. It must be done, by some word communicated to the servant."

Our disagreement with the administrative law judge in this regard is prompted by our conclusion that if the hospital had a right to discharge the striking employees before the effective date of the amendments, the overwhelming evidence in the record indicates that the employees knew that they were, in fact, terminated. It is true that the hospital did not send individual termination notices to each striking employee. Nevertheless the intent was unmistakably communicated. Prior to the strike the company posted notices that strike activity would result in discharge. Provisions in the employment regulations provided to all employees clearly stated that absence from work without notice was cause for dismissal. Shortly after the strike began a "notice of termination" was placed in each striker's personnel folder terminating employment for failure to give notice. These facts clearly satisfy the qualification in *Percival* that:

> No set form of words is necessary; but any words or acts which show a clear intention on the part of the master to dispense with the servant's services, and which are equivalent to a declaration to the servant that his services will be no longer accepted, are sufficient.

*Id.* 185 P. at 974.

Other than to assert it as a naked fact, the Board has not endeavored to support its

claim that under Kentucky common law the strikers were not discharged before the amendments became effective. For its part the hospital relies primarily upon *Kentucky Unemployment Ins. Comm. v. Murphy*, 539 S.W.2d 293 (1976). There the Kentucky Supreme Court held that direct personal notice to the employee was not necessary to terminate an employment relationship where the employee had knowingly failed to comply with the requirements of employment.[10] On the basis of *Murphy*, we conclude that, faced with the circumstances here, the Kentucky courts would find that the strikers had voluntarily terminated their own employment by failing to comply with hospital regulations upon notification of the threatened consequences, and that under Kentucky law the striking employees were terminated prior to the effective date of the amendments.

■ Alternatively, the Board urges that irrespective of Kentucky law, the hospital was bound to treat the striking workers as employees within the meaning of Section 2(3) of the Act, 29 U.S.C. § 152(3), since their protected status as employees demanded that they be reinstated to their former positions upon cessation of the strike. This argument is based upon the administrative law judge's ruling that even if the hospital had given adequate notice of termination to the strikers, their rights to reinstatement would not be affected since the termination would occur as a result of, or in connection with, a current labor dispute. The administrative law judge reasoned that since a recognition strike was in

where we held as a matter of federal law that the language relied upon by the employer as proof of termination was prospective only and not final. For example, in *Shopmen's Local Union* a company letter informed strikers that if they did not return to work by a certain date "your employment will thereupon be permanently terminated." However, due to the inconsistent act of reinstating all employees who had not been replaced and had sought to return to work after the critical date, we upheld the Board's determination that the letter was ineffective.

10. In *Kentucky Unemployment Ins. Comm. v. Murphy*, 539 S.W.2d 293 (1976), the employer had informed a female employee who had appeared for work in a pantsuit, "not to come back to work wearing a pantsuit." The employee, however, quit work rather than comply with the employer's mandate. Thereafter, she applied for Workmen's Compensation on the basis that she had been discharged. In reversing an award for the employee, the Kentucky Supreme Court observed that, "the requirement that she not wear a pantsuit was her only barrier between employment and unemployment; the choice was solely hers."

progress at the time the Board assumed jurisdiction over labor disputes involving non-profit health care institutions, the strikers remained employees under Section 2(3) of the Act and were entitled to reinstatement notwithstanding any actual effort by the company to replace them.

This precise argument was decided under analogous circumstances in *Woodlawn Hospital v. NLRB*, 596 F.2d 1330 (7th Cir. 1979). In an exhaustive treatment of the issue, the Seventh Circuit concluded that an employee who had been effectively discharged by a hospital employer for striking prior to the effective date of the amendments did not acquire "employee" status once the amendments became applicable to the employer. The court reasoned that before the amendments, Congress had permitted health care employees to exercise traditional common law prerogatives over the employment relationship. It expressly rejected case authority relied upon by the Board to the effect that the Wagner Act applied to employees fired prior to its effective date. *Id.* at 1337. After reviewing the *Woodlawn Hospital* decision, we have nothing to add to the careful treatment given this subject by the Seventh Circuit. Therefore, contrary to the Board's position, those striking employees who were discharged before the effective date of the amendments were not entitled to reinstatement to either their former or substantially equivalent positions, nor were they entitled to any seniority or other rights or privileges which would otherwise have attached by reason of that prior employment, including lost earnings.

### V.

█ Finally, there remains the Board's determination that the hospital was guilty of discrimination by refusing to hire the former employees because of their concerted union activity after the date of the health care amendments.

The Board's finding that the hospital categorically refused to accept any application for employment from any of the former striking employees after the effective date of the amendments is supported by substantial evidence upon the record as a whole in this case. The facts here clearly place the case within the principle of *Phelps-Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), wherein it was held that it is unlawful discrimination under the Act to refuse to hire applicants for employment because of protected union activity.[11] The record before us shows that the company hired hundreds of employees after the effective date of the amendments while at the same time refusing to consider any striker as an applicant for new employment. As we have already noted, the hospital has specifically declined to charge any individual striker with specific acts of misconduct which might otherwise justify its refusal to hire that striker, and participation in the strike alone would not provide a legitimate reason for refusing to consider the application. It therefore appears that the Board's finding is supported by substantial evidence and that the employer's refusal to hire the strikers as new employees violates Section 8(a)(1) and (3) of the Act.

### VI.

In summary, we conclude that the striking employees were not required to comply with the 10-day notice requirement of Section 8(g) of the Act since the strike was already in progress on the effective date of the health care amendments, and that absent proof of specific individual misconduct the company may not deprive a protected employee of any rights he might possess under the Act. However, we also conclude

11. Once more we repair to *Woodlawn v. NLRB*, 596 F.2d 1330 (7th Cir. 1970). While the Seventh Circuit reached a different result upon the facts there, *Woodlawn* recognized that where the company's refusal to hire was based upon the applicant's union status, a violation of the Act would be found:

> We emphasize that this result does not leave Woodlawn free to discriminate against its discharged strikers on the basis of their union activity. Woodlawn would violate the Act by refusing to hire the former employees on discriminatory grounds related to concerted employee activity.
> *Id.* at 1337.

that under Kentucky common law, the striking employees were effectively terminated prior to the effective date of the amendments and therefore did not acquire "employee" status under the Act merely because the strike was in progress on the effective date. Therefore, although the striking employees were not entitled to reinstatement as returning employees, with the right of restoration of seniority and other rights and privileges arising from the former relationship, substantial evidence upon the record as a whole supports the Board's finding that the hospital discriminated against those striking employees who had made application for new employment with the hospital after the effective date of the amendments.

Accordingly, enforcement of those portions of the Board's order not consistent with this opinion are denied. The order under review as upheld will be enforced.

No costs, neither side having prevailed in full.