[No. 7068-9-III.   Division Three.   August 14, 1986.]

PLUMBERS AND STEAMFITTERS UNION LOCAL 598, ET AL, *Appellants,* v. WASHINGTON PUBLIC POWER SUPPLY SYSTEM, *Respondent.*

*John Burns, Michael McGrorey,* and *Hafer, Price, Rinehart & Schwerin,* for appellants.

*Stanley J. Bensussen,* for respondent.

GREEN, C.J.—On November 17, 1982, Mr. Manion, a security officer employed by the Washington Public Power Supply System (WPPSS), was on patrol in the swing shift parking lot on the west side of WNP–2, a nuclear plant under construction in Benton County. He reported:

I observed about 75 crafts people approaching the bus parking area where a Ben Franklin bus was offloading personnel. As I approached, I observed some rocks being thrown at the bus. As the craft people on the bus attempted to exit, the people from the parking lot blocked their way. One of the individuals on the bus did step off the bus onto the ground. . . . He was later identified to me as:

Rodney Harrington, Carpenter
Badge No. 0009

As he stepped onto the ground he was struck in the face by one of the craft personnel from the parking lot, knocking him back against the side of the bus. I stepped in to stop the fight pulling one of the men off Harrington who had been hit. I was grabbed by some of the people from the parking lot and kept from stopping the fight. I turned to some of the craft people in the parking lot and asked them to stop the fight. As I turned back to see what was happening, I observed that Mr. Harrington was surrounded by about 25 crafts people and was lying on the ground being kicked by someone and being struck about the face and head by others. The crafts people I had asked to stop the beating stepped in and did stop it.

I made contact with:

Rodney Harrington
WNP–2 First Aid Station

where he was receiving treatment for facial injuries. I asked Harrington if he would prepare a statement of circumstances surrounding his injuries and identify the individuals involved. Harrington stated he did not know any of the individuals and refused to discuss the incident with anyone except his Union Business Agent.

A Mr. Frank Sartain, Carpenter General Foreman made contact with me at the WNP–2 First Aid Station and provided a written statement (Attachment #1).

Attachment #1

I was on my way to work, when I got off the Ben Franklin Bus. I was on the first bus about 7:00 AM. There were about 10 people waiting in the swing shift parking lot, then more people came [approximately] 30. Garry Young was grabbed in [the] front part of his leather jacket, and jerked around. He handed me his lunch box; several in the group went to calling us names. *Don Lane* grabbed my arm, I pulled loose, then he swung on me, and hit me in the left jaw. I walked away toward the gate and there were a large [number] of people going toward the bus stop. I was told that the man that shook Garry up, name was *Bud Wright*. I can identify him.

/s/ Frank Sartain, Sr.
11–17–82

Witness
/s/ Robert A. Manion
11–17–82

(Italics ours.) This incident arose because union employees were being transported to work on nonunion buses. As a protest, the group had gathered in the parking lot to prevent them from leaving those buses. Initial investigation by WPPSS identified some of the participants in the melee and on November 19, WPPSS issued letters to Donald Lane, Larry J. Saltz, Buddy D. Wright, Pedro A. Nicacio III, Roy A. Saltz and Allen Detrick suspending each of them from coming onto WPPSS property. They were given 5 days to respond in writing as to mitigating circumstances before WPPSS reached a final decision on the matter. Those men were employed by Bechtel Corporation, a WPPSS subcontractor. On the same day, November 19, Bechtel fired these six workers without waiting for WPPSS to complete its investigation and reach a final decision. Thereafter, each of the workers submitted written statements admitting their presence at the affray. WPPSS completed its internal investigation and on December 1, 1982, restricted some for 30 days and the rest for 1 year from its property. This investigation included statements from

other union workers who witnessed the event and identified the involvement of the six workers and requested anonymity because they feared retaliation. WPPSS honored their request.

The six workers first challenged Bechtel's right to terminate their employment and following arbitration, the arbitrator upheld the discharges. They then commenced this action against WPPSS for damages contending WPPSS had no right to restrict them from coming onto WPPSS property and as a result tortiously interfered with their contract of employment by Bechtel. The trial court limited the trial to the question of liability, deferring the question of damages. Following that hearing, the court held in favor of WPPSS and dismissed the action. The six workers and Plumbers and Steamfitters Union Local 598 appeal.

Four basic issues are presented: (1) Did WPPSS have the underlying authority to restrict the workers from coming onto WPPSS property? (2) Were the workers engaged in protected labor activity? (3) Did WPPSS unlawfully deprive the workers of a protectable property or liberty interest without due process of law? (4) Did WPPSS tortiously interfere with the workers' employment contract with Bechtel? We affirm.

First, the contention WPPSS had no authority to preclude people from coming onto its property must be rejected. An operating agency constructing or operating a nuclear power plant has statutory authority to establish a security force for the protection and security of the site. RCW 43.52.520. Members of the security force "may use reasonable force to detain, search, or remove persons who enter or remain *without permission* within the nuclear power plant site . . ." (Italics ours.) RCW 43.52.530(1). Implicit in this provision is the power to grant permission. Inherent in the power to grant is the authority to withdraw its permission for the six workers to come onto its property.

Second, the contention that the rules the workers allegedly violated were not properly adopted pursuant to the rulemaking procedure delineated in the administrative

procedure act (APA) must also be rejected. "WPPSS is a municipal corporation", *Lampson Universal Rigging, Inc. v. WPPSS,* 105 Wn.2d 376, 379, 715 P.2d 1131 (1986); RCW 43.52.250, .360, with the power to "make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." Const. art. 11, § 11. A municipal corporation is not an "agency" as defined in the APA, RCW 34.04.010(1), because it is not a "state agency". Rather it is a "local agency". RCW 42.17-.020(1).[1] Thus, the Washington APA does not apply and WPPSS need not comply with its rulemaking procedure. *Riggins v. Housing Auth.,* 87 Wn.2d 97, 100–01, 549 P.2d 480 (1976).

Third, it is claimed the workers were engaged in protected labor activity and therefore could not be penalized for their actions. We disagree.

RCW 49.36.010[2] allows working men and women to organize themselves and carry out the legitimate purposes of the union by "any lawful means." However, concerted activities which are unlawful, violent, in *breach of contract,* or indefensible are not protected. *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 8 L. Ed. 2d 298, 304, 82 S. Ct. 1099 (1962); *see also Coors Container Co. v. NLRB,* 628 F.2d 1283, 1287 (10th Cir. 1980); *Mosher Steel Co. v. NLRB,* 568 F.2d 436, 442 (5th Cir. 1978); *Florida Steel Corp. v. NLRB,* 529 F.2d 1225, 1234 (5th Cir. 1976); *NLRB v. Red Top, Inc.,* 455 F.2d 721, 727 (8th Cir. 1972); *Corri-*

---

[1]RCW 42.17.020(1) defines agency:

"'Agency' includes all state agencies and all local agencies. 'State agency' includes every state office, department, division, bureau, board, commission, or other state agency. *'Local agency' includes* every county, city, town, *municipal corporation,* quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency." (Italics ours.)

[2]RCW 49.36.010 provides:

"It shall be lawful for working men and women to organize themselves into, or carry on labor unions for the purpose of lessening the hours of labor or increasing the wages or bettering the conditions of the members of such organizations; or carry out their legitimate purposes by *any lawful means.*" (Italics ours.)

*veau & Routhier Cement Block, Inc. v. NLRB,* 410 F.2d 347, 351 (1st Cir. 1969). Concerted activity which interferes with or blocks the ingress and egress of employees and others at a place of employment is considered inherently coercive and thus unprotected labor activity. *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 132, 2 L. Ed. 2d 151, 78 S. Ct. 206 (1957); *NLRB v. Service Employees Int'l, Local 254,* 535 F.2d 1335 (1st Cir. 1976); *NLRB v. United Mine Workers,* 429 F.2d 141, 146 (3d Cir. 1970); *15 McKay Place Realty Corp. v. 32B–32J, Service Employees Int'l Union,* 576 F. Supp. 1423, 1428 (E.D.N.Y. 1983); *see also Bering v. Share,* 106 Wn.2d 212, 224–25, 721 P.2d 918 (1986).

Further, here, the stabilization agreement for WPPSS units 1, 2, and 4 signed by Bechtel and the union specifically provides in 15(1):

> There shall be no strikes, work stoppages, slowdowns or other collective actions which will interfere with, or stop the efficient operation of, construction work of the Employers. Participation by an employee, or group of employees, in an act violating the above provisions will be cause for discharge . . .

Thus, under this agreement Bechtel had the authority to discharge the six workers even if WPPSS had not restricted their access to the property.

Further, the six workers in their own letters and statements to WPPSS presenting mitigating circumstances clearly establish that the group of union workers gathered in the swing shift parking lot on November 17, 1982, about 7 a.m. interfered with or blocked the ingress of employees on the buses. Larry J. Saltz, in his letter, stated:

> At this time I went over to another bus which was getting ready to stop. This is when I went to the door of the bus to explain about non union buses to some of the union personnel riding it. Then I proceeded to say "Please stay on the bus." . . .
>
> I repeated myself 3 to 4 times saying "please" every time.

In a more detailed statement, he said:

We walked over to the buses and asked the passengers to *please get back on the bus, we don't want any trouble.* One of the passengers, Rod Harrington, approached me with vocal language and asked me "Who in the fuck are you?" and he said "Are you trying to prove something to me?" I responded, "*I don't want to start any trouble,* please get back on the bus."

(Italics ours.) Roy Lee Saltz gave the following description of the incident:

By then the second bus had arrived and was coming to a halt. When the bus stopped my brother and I went to the door to explain to the people on the bus that this is a non–union bus and that since they are union people it was not right for them to ride it. We continued by saying "*Please stay on the bus*" (exact words) and repeated three or four times *because we didn't want to see another confrontation.* At this time a man named Rod Harrington . . . came out of the bus and my brother repeated "Please stay on the bus" and Mr. Harrington asked what he was going to do to stop him and at the same time Rod pushed my brother and went into his coat for a knife. This is when my brother stopped him in self defense and then put him back on the bus so he would not be hurt anymore. The bus then continued down the road.

(Italics ours.) Allen Detrick stated:

I was with a group of people who met the bus trying to talk the people into not riding the bus . . . I talked to some people that came off the bus to try to convey our feelings about the situation.

Donald Lane stated:

I proceeded to the gate and noticed a large crowd and I went to investigate it, and witnessed people telling other people who were riding the bus they should not be riding it because it was non–union. I saw one of our local brothers . . . who was riding the bus and I told him my beliefs on why he shouldn't be riding the bus.

Buddy Wright stated:

So then we proceeded to ask some of our own brothers why they were riding a non–union bus, and we only talked to them . . .

Pedro A. Nicacio III, in his letter, stated:

> The first bus had just left and the second bus was arriving. I stood by and saw some men go to the bus and talk to the people on the bus, and the bus then left. A third bus arrived, and again a group of men went to the bus and talked to the passengers, while I stood by in the crowd watching. I saw Rod Harrington walk off the bus and push one of the men and a fight started. After the fight, Harrington got back on the bus. The bus then pulled away . . .

Also, there is overwhelming evidence of the coercive atmosphere during the incident, for example: Don Lane stated in his letter that he grabbed Frank Sartain's arm and hit him once; Larry Saltz's statement tells of the altercation between himself and Rod Harrington; and his brother Roy's statement and letter corroborate Larry's and Don Lane's statements about the altercations they were involved in; Pedro Nicacio III's and Allen Detrick's statements clearly demonstrate violence occurred during the incident; WPPSS security guard R. A. Manion, who was an eyewitness to the incident, stated:

> I observed some rocks being thrown at the bus. As the craft people on the bus attempted to exit, the people from the parking lot blocked their way. One of the individuals on the bus did step off . . . As he stepped onto the ground he was struck in the face by one of the craft personnel from the parking lot, . . . I observed that Mr. Harrington was surrounded by about 25 crafts people and was lying on the ground being kicked by someone and being struck about the face and head by others.

Frank Sartain, one of the injured employees riding the bus, made a written statement specifically identifying Don Lane as the person who assaulted him—"Don Lane grabbed my arm, I pulled loose, then he swung on me, and hit me in the left jaw." Bechtel's injury record on Rodney Harrington dated November 17, 1982, states he had contusions to his head and right eye; Bechtel's injury record on Frank Sartain stated minor injury to right hand, contusion to his jaw and a sprained right wrist. From the above it is clear this was a concert of action by all of the union workers assem-

bled in the swing shift parking lot on the morning in question to coerce and prevent the union employees riding on nonunion buses from leaving those buses and going to work. This concerted action by the group to block the egress of workers from the buses and their ingress to the plant is not a protected labor activity. Moreover, the entire event was in direct contravention of the specific provisions of the WPPSS stabilization agreement signed by the union.

Fourth, the contention the workers had a constitutional right to retain their jobs free from unreasonable government interference is without merit.

The right to hold specific private employment and follow a chosen profession free from *unreasonable* government interference is a fundamental right which comes within the liberty and property concepts of the Fifth Amendment. *Greene v. McElroy*, 360 U.S. 474, 492, 3 L. Ed. 2d 1377, 79 S. Ct. 1400 (1959); *Duranceau v. Tacoma*, 27 Wn. App. 777, 780, 620 P.2d 533 (1980). Here, in light of the unprotected labor activity in which the six workers took part, we find WPPSS' suspension of them reasonable.

Further, *Greene* has been restricted to its particular facts and construed to mean liberty and property interests are implicated in an employment discharge situation if the government: (1) imposes a stigma and thereby forecloses the employee's freedom to obtain other employment; or (2) dismisses an employee on grounds calling into question his integrity, honor, or good name in the community. *Jordan v. Oakville*, 106 Wn.2d 122, 131, 720 P.2d 824 (1986); *Ritter v. Board of Comm'rs*, 96 Wn.2d 503, 510, 637 P.2d 940 (1981); *Giles v. Department of Social & Health Servs.*, 90 Wn.2d 457, 461, 583 P.2d 1213 (1978); *Butler v. Republic Sch. Dist.*, 34 Wn. App. 421, 661 P.2d 1005 (1983). With respect to the first prong, the six workers failed to produce any evidence they were unable to obtain employment in their chosen occupation elsewhere, as occurred in *Greene v. McElroy*, 360 U.S. at 475–76. As to the second prong, "[n]early any reason assigned for dismissal is likely to have some negative reflection on an individual. However, not

every dismissal assumes a constitutional magnitude." *Giles v. Department of Social & Health Servs., supra* at 461. The six workers here were suspended from WPPSS' property for violation of WPPSS' security rules. Such activity does not implicate the workers' integrity, honor or good name in the community. Therefore, the six workers have not established interference with a protected property or liberty interest in any event.

Moreover, the six workers were not WPPSS employees so the suspension did not terminate any employment relationship between them. WPPSS merely suspended the workers from coming on its property because of their participation in unprotected activity in violation of its site security rules. The workers have failed to establish any constitutional right to come onto WPPSS property.

Fifth, it is argued WPPSS' summary procedure denied them notice of the evidence against them and an opportunity for hearing and thus, they were denied that process due as a necessary prerequisite for deprivation of a constitutionally protected right. Since we have held the workers did not have a constitutional right to come onto WPPSS property, no constitutional due process rights such as notice and hearing are involved. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985), cited by the workers, is distinguishable because there Loudermill sued his employer, Cleveland, for not providing a pretermination hearing. Other cases cited by the workers are similarly distinguishable. Here, the workers were not employed by WPPSS.

However, assuming arguendo some procedural process was due, the scope of due process application is flexible, that is, "not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey v. Brewer*, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972); *Dawson v. Troxel*, 17 Wn. App. 129, 131, 561 P.2d 694 (1977). There must be a weighing of the governmental action against the private interest that has been affected. *Cafeteria & Restaurant Workers Local 473 v.*

*McElroy,* 367 U.S. 886, 895, 6 L. Ed. 2d 1230, 81 S. Ct. 1743 (1961). Even an employee protected by the state civil service laws does not have a due process guaranty of a hearing prior to termination. *Halliburton v. Huntington,* 20 Wn. App. 91, 95, 579 P.2d 379 (1978); *Ticeson v. Department of Social & Health Servs.,* 19 Wn. App. 489, 494–95, 576 P.2d 78 (1978). In fact, *Arnett v. Kennedy,* 416 U.S. 134, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974) held a post–termination hearing is sufficient to protect those interests meriting due process protection, whether those interests were in the nature of "property" or "liberty". "Due process requirements are not technical, nor do they require any particular form or procedure." *Parker v. United Airlines, Inc.,* 32 Wn. App. 722, 727–28, 649 P.2d 181 (1982) (citing to *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895, 1901 (1974)).

Here, WPPSS' "Policy for Review of Violations of Safety/Security Regulations" provides:

> The Supply System will, in all cases, provide a fair and impartial review of reports of violations of Safety/Security rules that may result in disciplinary action against an individual. This review will include Supply System Project Management and Safety/Security Management and offer an opportunity for input through Bechtel Labor Relations by the affected individual's Labor Union Representative prior to disciplinary action being taken.
>
> . . .
>
> In those incidences where immediate suspension from Supply System property is deemed to be in the best interest of the Supply System, (drugs, fighting, etc.), the projects will notify Security Management and a suspension letter will be immediately dispatched to the individual and Bechtel Labor Relations. Bechtel Labor Relations is responsible for notifying the individual's Business Agent of the suspension. Business Agent/Individual must respond to Supply System project management through Bechtel Labor Relations with mitigating circumstances concerning actions taken within 5 working days. Review process remains the same.

Several important facts must be noted. First, unlike the

cases cited above, WPPSS was *not terminating* the employment of the six workers. Suspension, being less severe than termination, logically requires less due process protection. Second, Bechtel terminated the six workers' employment before WPPSS had completed its investigation and review and made a final decision. WPPSS did not complete its review process until December 1, 13 days after the incident. Even if WPPSS had afforded the six workers a hearing before an impartial tribunal, with the entire panoply of procedural due process rights, and decided the six workers should not be restricted, there is nothing to indicate Bechtel would be required to rehire them. Once Bechtel terminated the six workers, a hearing at this stage by WPPSS would not have prevented that which had already occurred.

Sixth, it is contended there was no evidence to support the conclusion WPPSS' rules were violated; thus, WPPSS arbitrarily and capriciously restricted the workers from its property. We disagree.

WPPSS' site security rules, which were posted around the plant of WPPSS project 2, specifically prohibit disruption of site construction activities and physically assaulting others. Moreover, the union's agreement with Bechtel prohibited such disruption. Here, as presented earlier in this opinion, the security guard who was an eyewitness to the incident stated he observed the union workers blocking the way of the employees who were attempting to exit the buses and the physical assault by the union workers of a person who got off one of the buses. This was corroborated by the written statement of one of the victims. Finally, the six workers' own statements admit to conduct which obstructed the employees ingress onto WPPSS property and that violence occurred. No due process procedure was required prior to WPPSS' suspension of the six workers pending further review. Even if the anonymous informant statements were not considered, there was sufficient evidence to support WPPSS' action in restricting the six workers from its property.

Seventh, it is claimed the WPPSS procedure was unrea-

sonable because a longer response time is given for parking violations than for safety/security violations. We disagree.

WPPSS' "Policy for Review of Violations of Safety/ Security Regulations" provides that in those incidences where immediate suspension from WPPSS property is deemed to be in the best interest of WPPSS, the suspended worker is only allowed 5 working days to respond with any mitigating circumstances while a worker with a parking violation is allowed 10 working days to respond with any mitigating circumstances. The differences in the worker's response time is not unreasonable for two reasons. One, when a distinction is based on a legitimate governmental interest such as police powers, then no violation of due process occurs. *Ford v. Bellingham–Whatcom Cy. Dist. Bd. of Health,* 16 Wn. App. 709, 558 P.2d 821 (1977). Here the distinction and procedures afforded are due to the fact the safety and security of the WPPSS plant is at issue, *i.e.,* a legitimate exercise of police power exists. Second, the shortened response time with the suspension from WPPSS property versus that for parking violations is actually of benefit to the worker. It stands to reason that one who has been suspended and thus cannot work would want the alleged violation dispute resolved quickly so he could return to work as soon as possible.

■ Eighth, it is asserted the workers' equal protection rights were violated because WPPSS only took action against them and took no action against the others involved in the episode. We disagree. Equal protection requires persons similarly situated be similarly treated, *Jenkins v. State,* 85 Wn.2d 883, 540 P.2d 1363 (1975), *i.e.,* the law must be applied equally to members of the same class. *Duffy v. Department of Social & Health Servs.,* 90 Wn.2d 673, 585 P.2d 470 (1978). However, laxity in enforcement of a rule or regulation as to some is not a defense on equal protection grounds to enforcement against others absent the use of arbitrary or prohibited grounds to determine the specific instances of enforcement. *Crown Zellerbach Corp. v. Department of Labor & Indus.,* 98 Wn.2d 102, 110, 653

P.2d 626 (1982); *Somer v. Woodhouse,* 28 Wn. App. 262, 267, 623 P.2d 1164 (1981). Here, the six workers argue there were two sides to the dispute yet they were the only ones disciplined. However, they do not point out how this distinction was arbitrary or made on prohibited grounds. The evidence shows they were in the group which initiated the incident. The law does not prevent WPPSS from making an example of them.

Ninth, it is contended WPPSS impaired the obligation of the union's contract with Bechtel by restricting the six workers from the workplace precipitating their loss of contract employment rights. We need not consider this contention as it was neither raised in the trial court nor is adequate authority cited on appeal. *In re Rosier,* 105 Wn.2d 606, 616, 717 P.2d 1353 (1986). "'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *In re Rosier, supra* at 616 (quoting *United States v. Phillips,* 433 F.2d 1364, 1366 (8th Cir. 1970)).

Finally, the contention that WPPSS tortiously interfered with the workers' contract rights is rejected.

■ The elements of the tort of interference with a business expectancy are: (1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the alleged interfering party; (3) intentional interference which induces or causes breach or termination of the relationship or expectancy; and (4) resultant damage. *Sea–Pac Co. v. United Food & Comm'l Workers Local 44,* 103 Wn.2d 800, 805, 699 P.2d 217 (1985). Even if all four elements are present (as the dissent contends they are here), interference is justified as a matter of law if the interferer has engaged in the exercise of an absolute right equal or superior to the right which was invaded. *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 375, 617 P.2d 704 (1980); *Topline Equip., Inc. v. Stan Witty Land, Inc.,* 31 Wn. App. 86, 93, 639 P.2d 825 (1982). "An absolute right exists only where a person has a definite legal right to act, without any qualification." *Topline Equip., Inc. v. Stan*

*Witty Land, Inc., supra* at 94.

Here, WPPSS has a right both at common law and by statute to protect its own property and to preclude persons who have no permission to enter. RCW 43.52.530(1). Moreover, the workers' activity was a direct violation of the union agreement with Bechtel.

Affirmed.

MUNSON, J., concurs.

THOMPSON, J. (dissenting)—I respectfully dissent. The evidence presented (1) fails to establish that the restricted workers were engaged in unprotected labor activity; (2) WPPSS failed to abide by its own rules and procedures in imposing sanctions against the six workers; and (3) WPPSS acted as accuser, investigator, judge, jury and sentencer. This method of imposing its restrictions constituted an intentional and unjustifiable third party interference with valid contractual relations between Bechtel and the six workers.

WPPSS' security officer, Robert Manion, who was at the scene on November 17, 1982, filed a report describing the incident, but he was unable to identify any of the participants. He interviewed some of the passengers on the bus in an effort to determine the identity of the "picketers". The identity of the passengers interviewed and the contents of their statements were never revealed. The officer did not interview any of the "picketers" or any of the six workers restricted for participating in the melee. Out of the estimated 75 workers involved in the picketing, 14 individuals were identified as either being involved, or possibly involved, and 6 were restricted from WPPSS' property.

On November 19, three workers were advised by letter they had violated WPPSS' published security regulations by participating in a disruption of construction activity, and three others were advised by letter they had violated WPPSS' regulations by physically assaulting a fellow worker. The letters did not state specific allegations of mis-

conduct or advise the six which security regulations had been violated. Each of the six were "immediately restricted indefinitely from access to any Supply System property". The six were given 5 days to submit in writing any circumstances which mitigated their actions.

Each of the six workers responded in writing and admitted they were present at the rally. Each averred he drove separately into an adjoining parking lot, noticed a large crowd forming in the swing shift parking lot, and went to investigate. Although no illegality is involved in entering the swing shift parking lot, WPPSS attacks the credibility of this explanation since the morning crew had no reason to enter the swing shift parking lot. Four of the six workers categorically denied they participated in acts of violence or disrupted construction activities. Two stated they were involved in altercations, but acted in self-defense. Four of the workers stated they had witnesses to corroborate their statements.

Thereafter, on December 1, the day WPPSS received the statements from the six, Detrick, Nicacio, and R. Saltz were restricted from access to WPPSS property for 30 days, and Lane, Wright, and L. Saltz were restricted for 1 year. It is unclear from the record whether WPPSS even considered the accuseds' statements before making their final decision.

Klingelhoefer, WPPSS' manager of Safeguards and Investigations, testified that WPPSS followed its internal procedures which provided for immediate suspension from WPPSS property when such suspension was deemed to be in the best interest of WPPSS. WPPSS' procedures, which were posted and distributed to all the workers, specified that all individuals subject to discipline would be given 5 days to respond in writing as to any mitigating factors and that "[t]he Supply System will, in all cases, provide a fair and impartial review of reports of violations of Safety/Security rules that may result in disciplinary action against an individual".

Klingelhoefer testified:

[N]othing in the responses changed the story from what we had originally from our interviews and our investigative process. As I stated, the individuals confirmed that they were present at the time. Essentially, I saw no mitigating circumstances that would cause me to believe that we had misidentified any of these individuals or their roles.

Klingelhoefer also testified that the reason he felt there were no mitigating circumstances was because the letters from the six did not contradict or address the issues in the informants' statements.

Klingelhoefer further testified that when the November 19 letters were sent, WPPSS had already concluded that there had been a violation of WPPSS rules. Additionally, Klingelhoefer made his final conclusions and recommendations to his superiors before receiving the written statements from the six.

Harrington, one of the three people who made the ultimate decision to restrict access, testified the letters from the six workers confirmed that the individuals were in fact there. On the same day WPPSS restricted access to the six workers, their employer Bechtel terminated their employment. The termination was later upheld by an arbitrator because the restriction from WPPSS' worksite meant "there was no available work for the six Grievants . . ."

Three of the workers were restricted simply because they were present at a rally where violent acts occurred without further proof they had engaged in those acts. Neither the trial court nor WPPSS addressed the issue of whether the gathering was a protected labor activity. The majority concludes the violence and unlawful acts rendered the entire incident an unprotected labor activity. Chapter 7 of the National Labor Relations Act, 29 U.S.C. § 157, does not protect any concerted activities which are unlawful, violent, in breach of contract or indefensible. However, under these facts, the majority applies this section too broadly. Chapter 7 does not mean that if violence occurs during protected labor activities, the entire incident becomes unprotected.

Rather, the courts have uniformly held that unauthorized acts of violence on the part of individual strikers are not chargeable to other union members in the absence of proof that identifies them as participating in such violence. *Methodist Hosp. of Ky., Inc. v. NLRB,* 619 F.2d 563 (6th Cir. 1980); *NLRB v. Sea–Land Serv., Inc.,* 356 F.2d 955 (1st Cir. 1966); *NLRB v. Lambert,* 211 F.2d 91 (5th Cir. 1954); *NLRB v. Deena Artware, Inc.,* 198 F.2d 645 (6th Cir. 1952); *Berkshire Knitting Mills v. NLRB,* 139 F.2d 134 (3d Cir. 1943), *cert. denied,* 322 U.S. 747 (1944); 2 *The Developing Labor Law* 1019–20 (2d ed. 1983).

As stated in *Methodist Hosp. of Ky., Inc.,* at 567, the employer may not rely upon unauthorized acts of misconduct as a basis for holding the union members were engaged in unprotected behavior. Rather, the employer must offer proof of identity as to the particular miscreant. The three were wrongfully terminated.

As to the three that were suspended for physically assaulting a fellow worker, if in fact each did participate in an unlawful assault and were not acting in self–defense, then they were not engaged in protected labor activity. According to WPPSS' witnesses, those actively engaged in assaults were identified based solely on statements from witnesses who requested anonymity. WPPSS did not interview any of the accused or any other workers at the rally. The only people interviewed were the passengers on the bus and WPPSS security officers. Further, WPPSS discounted the workers' explanations because the workers did not address the issues raised by the undisclosed statements; but the workers had not been told the contents of those statements. WPPSS' method of determining who should be suspended did not comport with even the most rudimentary concepts of fairness. The six workers were told they were guilty of unnamed acts which were a violation of undesignated rules and guilt was determined through interviews with undisclosed witnesses who gave statements, the contents of which were likewise not disclosed. The workers were advised by letter, not that they may offer evidence of

their innocence, but only that they may provide statements of mitigating factors. Although each worker denied wrongdoing, their statements were given no weight by those charged with the responsibility of imposing sanctions. If the three who were restricted for physical violence did assault a fellow worker, they were involved in an unprotected labor activity. However, WPPSS' method of establishing identity and culpability leaves in serious doubt the validity of its final conclusion that the three accused assailants were in fact guilty.

Under a theory of agency or ratification, a union worker can be accountable for the violent acts of other union members. *NLRB v. Sea–Land Serv., Inc. supra.* However, agency or ratification cannot be based on the mere failure to abandon the activity or failure to repudiate and denounce the violence. *International Ladies' Garment Workers' Union v. NLRB,* 237 F.2d 545 (D.C. Cir. 1956). This rule is a necessary safeguard to the union and its members since in the confusion and tense situation created by a strike accompanied by picketing, it would be a simple matter to incite acts of violence and destroy the protected status of the strikers. *Sea–Land Serv., Inc.,* at 966.

I conclude that under RCW 49.32.050(5), (6), and (9), and RCW 49.36.010,[3] the November 17 gathering was a protected union activity. The noted statutes authorize

---

[3]RCW 49.32.050:

"(5) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(6) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

". . .

"(9) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in RCW 49.32.030."

RCW 49.36.010:

"Unions legalized. It shall be lawful for working men and women to organize themselves into, or carry on labor unions for the purpose of lessening the hours of labor or increasing the wages or bettering the conditions of the members of such organizations; or carry out their legitimate purposes by any lawful means."

union activity for legitimate purposes, which include giving publicity to the existence of a labor dispute, and authorize assembling and promoting union interests. Mere presence at such an activity wherein violence occurred did not render the entire gathering an unprotected activity, and the method of determining who was involved in violent acts was so unfair, the ultimate determination was tainted. Thus, I would conclude that the workers were engaged in protected labor activity and were illegally excluded from WPPSS' property.

WPPSS has a "Policy for Review of Violations of Safety/ Security Regulations" and is legally bound to follow those procedures in dealing with perceived violations of those regulations. *Brady v. Daily World,* 105 Wn.2d 770, 718 P.2d 785 (1986).

WPPSS' written policy for review of violations of safety/ security regulations was posted on all of the construction sites, and procedures were published internally within WPPSS and transmitted to Bechtel and the individual work force. The procedures provided for "a fair and impartial review of reports of violations of Safety/Security rules that may result in disciplinary action against an individual". This fair and impartial review was applicable to incidences where the individual was immediately suspended for fighting. WPPSS acted as accuser, investigator, judge, jury and sentencer. WPPSS accused the six of violating its regulations, WPPSS' security officials conducted the investigation, WPPSS' managers determined a violation had occurred, and WPPSS meted out the punishment.

As stated by C. Montesquieu in *L'Esprit des Lois* (1748):

> All would be lost if the same man or the same body of leaders, either of the nobles or of the people, exercised these three powers: that of making laws, that of executing the public resolutions, and that of judging criminal and civil cases.

W. Gwyn, *The Meaning of the Separation of Powers* 110 (1965) (quoted in *In re Juvenile Director,* 87 Wn.2d 232, 238, 552 P.2d 163 (1976)). The investigation conducted by

WPPSS, as previously described in this dissent, was so one-sided and so devoid of impartiality in the methods used to collect and evaluate evidence as to constitute a violation of WPPSS' promise to conduct a fair and impartial review. The workers were prejudged without a hearing, convicted without a voice, and punished severely without any recourse. The six were not accorded a fair and impartial review as promised in published WPPSS policy provisions.

Plaintiffs also alleged that WPPSS intentionally and unjustifiably interfered with the valid contract of employment with Bechtel. The facts support such a contention.

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1977).

The elements of the tort of intentional and unjustifiable third party interference with valid contractual relations or business expectancies are: (1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Calbom v. Knudtzon,* 65 Wn.2d 157, 396 P.2d 148 (1964).

The first, second and fourth elements are easily satisfied. The six workers' union had a contract and labor stabilization agreement with Bechtel. The individuals worked under the terms of those agreements when on WPPSS property and there is no dispute regarding WPPSS' knowledge of this contractual arrangement. Further, when WPPSS suspended the six workers, Bechtel terminated the workers for the sole reason they were "restricted by Supply System".

All the workers suffered pecuniary loss because they were unable to obtain other employment. The third element is the key. Did WPPSS intentionally and unjustifiably interfere with the workers' contractual relations? The interference must be both intentional and improper.

Interference is intentional if the actor acts for the primary purpose of interfering with the contract or if the actor does not act for the purpose of interfering with the contract or desire it, but knows that the interference is certain or substantially certain to occur as a result of his action. In other words, the rule applies to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his actions. Restatement (Second) of Torts § 766, comment *j*. Here, WPPSS can be presumed to know that if it suspended the six workers, the likelihood of termination by Bechtel was inevitable.

Factors the court considers when determining whether the interference is improper are: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. Restatement (Second) of Torts § 767.

When analyzing the actor's conduct, the issue is not simply whether the actor is justified in causing the harm, but rather, whether he is justified in causing it in the manner in which he does cause it. Here, WPPSS' failure to accord the accused workers any of the rights regarded as basic to a fair determination of culpability (*i.e.,* the right to know who your accusers are, the right to confront your accusers, the right to present witnesses on your behalf) leads to the conclusion that the manner in which WPPSS caused the harm was not justified. WPPSS had the right to try to avert violence and possible work stoppage. But the legitimate end

they sought to achieve will not whitewash the improper method of achieving it. Although WPPSS was attempting to protect an important interest of its own, it did so in an indefensible manner. WPPSS should be held liable for intentional and unjustifiable third party interference with a valid contractual relationship.

This case should be remanded for further proceedings to determine what damages were sustained by the workers as the proximate result of WPPSS' actions.

Reconsideration denied October 10, 1986.

Review denied by Supreme Court January 6, 1987.